No. 13,356.

ALLEN *v.* FLEMING ET AL.

(48 P. [2d] 810)

Decided May 27, 1935.   Rehearing denied September 9, 1935.

Messrs. Hodges, Wilson & Rodgers, Mr. James L. Goree, for plaintiff in error.

Messrs. Benedict & Phelps, for defendants in error.

*In Department.*

Mr. Chief Justice Butler delivered the opinion of the court.

Sadie J. Fleming and her two daughters, Anita S. Allen and Tessie F. Twogood, brought suit as minority stockholders of the Fleming Brothers Lumber Company against Calvin Fleming and his son, Robert Morton Fleming, a majority of the directors of the corporation, for an accounting of the transactions between the latter and the corporation. As the suit was brought for the benefit of the corporation, it was made a defendant. The amended complaint charged the individual defendants with various specific acts of mismanagement, misfeasance and malfeasance as directors and officers of the corporation, which charges the individual defendants denied. Sadie J. Fleming and Tessie F. Twogood voluntarily dismissed the suit so far as they were concerned, and it was prosecuted to the end by Anita S. Allen. After hearing the evidence, the trial court found in favor of the individual defendants and dismissed the suit. Anita seeks a reversal of the judgment of dismissal.

The manner of conducting the business and keeping the accounts of the Fleming Brothers Lumber Company was most unusual and informal. Something like fifty years ago two brothers, Jesse and Calvin Fleming, formed a partnership in Denver. They engaged in various activities. They were building contractors, bought, improved and sold real estate, and had a lumber yard and mill. In

1909, the corporation was organized and took over the business of the partnership. Of the 4,000 shares of stock issued by the corporation, 1,999 were issued to each of the partners and two were issued to their attorney, presumably to qualify him as a director.

The witness Almer W. Hendricks, who entered the employ of the partnership in May, 1907, and remained after the corporation was organized, and who for twenty years supervised the keeping of its books, thus describes the method of carrying on the business (quoting from the abstract of record): "It is pretty hard to explain just how the business of the corporation was conducted. Jesse Fleming would come and carry on his part of the business and make his contracts, and make his settlements there according to his way, and Calvin Fleming did the same thing, and maybe it would run for a year or a year and a half or two years, sometimes three or four years, and then they would have a settlement on these things. They would finally get together and have an adjustment, and put part of it on the books, and part of it they would not. I always used to tell them we had a one-sided set of books that was carried around in their heads most of the time. When transactions were finally registered or recorded in the books it would be some time after the transaction itself had been actually carried out. The material from which we made our book entries had different sources. Entries on stuff that went directly to the office were made from them, but at time of conferences which Jesse and Calvin Fleming had when they would get together and settle up certain bills standing on the books, I took my instructions from the two of them as to the credits that should be made and the disposition to be made of the accounts. Business of the company was not confined to the lumber business alone. They also handled real estate. Calvin Fleming at some times especially had some personal business of his own outside company business but Jesse Fleming, to the best of my recollection, carried on all his business through the company.

They used the company for real estate transactions, for the contracting business, and for the building of improvements on their own account, and on the company's account. That method of transacting business continued up and until the time of Jesse Fleming's death, November 26 [27], 1927. Jesse Fleming was active in the business up to the time of his death with the exception of about six months during 1919. He had been sick and during that time he went to Florida, and during that time he did not take much interest in the business. Immediately prior to his death he had been very active." The brothers never had any serious disagreement. It was usual for one of them to take up something in a business way, carry it along himself, and put it through the books as corporation business. They never had any trouble adjusting such matters. They talked them over "and whatever one did was always approved by the other." Neither during the existence of the partnership nor after the corporation was organized, while Jesse lived, was there any definite arrangement concerning salaries; each of the brothers drew out money from time to time. During the nineteen years next prior to the death of Jesse he drew a little over $92,000, and Calvin drew a little over $90,000. During the year next prior to the death of Jesse "the two drew a little over $23,000."

Such, in a general way, was the manner in which the brothers conducted the business of the partnership and that of the corporation.

On November 27, 1927, Jesse died and his widow and two daughters succeeded to his interest in the corporation. Thereafter the board of directors consisted of Calvin, his son Robert, to whom the two shares issued to the corporation's attorney had been transferred, and, as we infer from the record, Sadie J. Fleming, who took her deceased's husband's place upon the board.

1. In 1928 the board of directors fixed Calvin Fleming's salary at $1,000 per month, which later was reduced to $750, and still later to $500. The complaint

alleges that a fair and reasonable salary would be $300 per month, and that all amounts in excess of that are unreasonable and excessive. In the answer that allegation is denied. Upon this issue the trial court found against the plaintiff, and we cannot disturb that finding.

2. A similar situation exists with reference to an allowance of salary to Robert Morton Fleming. During the lifetime of Jesse, Robert's salary was fixed at $200 per month, and continued at that until May 1, 1931, when it was reduced to $175 per month. The complaint alleges that Robert's services were of no value to the corporation, which allegation is denied in the answer. Evidently Jesse considered Robert's services worth $200 per month, and the trial court found that the salary allowed Robert was reasonable. We would not be justified in interfering with that finding of the court.

3. Anita challenges the allowance by the trial court of credits to the individual defendants, based upon certain other transactions occurring after Jesse's death, and vigorously attacks the evidence supporting the correctness of the allowance. Such arguments, of course, were presented to the trial court. That court, however, did not consider them sound. We cannot say that the court was in error in allowing the credits.

4. The trial court allowed credits to Calvin based upon certain transactions that occurred during Jesse's lifetime. They were entered on the corporate books under date of June 30, 1927.

(a) One entry credited Calvin with $7,803 for cash paid by him for Florida lots. From the testimony of Calvin and his son it appears that the lots were bought for the corporation. Hendricks testified that he was instructed by Jesse and Calvin to make the entry on the books. The attack upon this transaction we do not regard as meritorious.

(b) A similar situation exists with reference to the Florida West Coast Development Company stock deal. The entry was made by Hendricks under instructions

from Jesse and Calvin, and Calvin and his son explained the deal to the satisfaction of the trial court. The trial court's allowance of the credit to Calvin must stand.

(c) Another transaction concerned the allowance of credit of $4,120 to Calvin, appearing on the corporation books under date of June 30, 1927. It purports to be for money due upon a note given by Jesse and paid by Calvin. Hendricks testified that Calvin paid the note and that both Jesse and Calvin ordered that the entry be made upon the books of the corporation. The allowance of the credit was proper.

5. Another group of objections concerns credits to Calvin and Robert for transactions that occurred during the lifetime of Jesse, the credits being entered on the corporation books after his death. It is not necessary for us to discuss the items in detail. From an examination of the record, we conclude that the findings of the court that Calvin and Robert are justly entitled to the several credits are supported by competent evidence, and ought not to be set aside by us.

6. Much of the evidence sustaining the findings of the trial court consisted of the testimony of Calvin and Robert. It is said that without their testimony the evidence was wholly insufficient to justify the findings, and that they were incompetent as witnesses by reason of section 6556, Compiled Laws, which prohibits any party to a civil action to testify therein, of his own motion, or in his own behalf, when any adverse party sues or defends as heir, etc., with certain exceptions not pertinent here. We cannot agree with the contention that the plaintiff in error sued as the heir of Jesse. She sued as a stockholder of a corporation, and whether she inherited or purchased her stock is not important. The section relied upon does not apply in such proceeding.

7. The manner in which the corporation books were kept is criticized. That the manner of transacting the business and keeping the books was unusual and informal has already been noted in this opinion. The man-

ner of doing business evidently was due to the fact that the brothers were the sole beneficial owners of the business and had implicit confidence in the judgment and honesty of each other, which confidence seems to have been inspired and justified by nearly fifty years of constant business association. In such circumstances, it is easy to understand how the brothers fell into the practice of conducting the business and keeping the books in such an unmethodical way. The loose practice followed by them would not be tolerated in the conduct of the business of a bank or a railroad company, and might in such cases raise a grave question concerning the honesty of those responsible therefor, but such practice was satisfactory to the brothers, was chargeable to both, and does not justify the suspicion that otherwise might arise. Neither brother could complain of the other on that score, and the plaintiff in error is in no better position to complain than was her father. All that she is entitled to demand is proof sufficient to sustain the credits allowed to Calvin and Robert by the trial court. In our opinion, the record contains such proof.

The judgment is affirmed.

MR. JUSTICE CAMPBELL and MR. JUSTICE HILLIARD concur.